## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## LAFAYETTE DIVISION

DENISE THOMAS,                        )
                                      )
    Plaintiff,                    )
                                      )
    v.                            )    CAUSE NO.: 4:16-CV-94-TLS
                                      )
NANCY A. BERRYHILL,                   )
ACTING COMMISSIONER OF THE            )
SOCIAL SECURITY                       )
ADMINISTRATION,                       )
                                      )
    Defendant.                    )

## OPINION AND ORDER

The Plaintiff, Denise Thomas, seeks review of the final decision of the Commissioner of the Social Security Administration denying her application for Disability Insurance Benefits and Supplemental Security Income. The Plaintiff argues that the Commissioner erred by: (1) making an arbitrary finding regarding the Plaintiff's residual functional capacity; and (2) failing to meet the requisite burden of proof at step five with regard to the conclusion that the Plaintiff could perform other work available in the national economy. For the reasons set forth below, the Court REVERSES and REMANDS this case for further proceedings in accordance with this Opinion and Order.

## BACKGROUND

In May 2013, the Plaintiff filed an application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 423(d), as well as an application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 1382c(a)(3), alleging disability beginning on October 13, 2012. (R. 182–194.) Her claims were denied initially on

August 15, 2013, and upon reconsideration on November 12, 2013. (R. 100–07, 110–15.) An administrative law judge (ALJ) conducted a video hearing on April 9, 2015, at which the Plaintiff—who was represented by an attorney—and a vocational expert (VE) testified. (R. 31–57.) On April 29, 2015, the ALJ denied the Plaintiff's application, finding she was not disabled as of her alleged onset date. (R. 16–25.) On September 16, 2016, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied the Plaintiff's request for review. (R. 1–3.) The Plaintiff filed this claim in federal court against the Acting Commissioner of the Social Security Administration on November 17, 2016 [ECF No. 1].

## THE ALJ'S FINDINGS

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but also any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience. §§ 423(d)(2)(A), 1382c(a)(3)(B).

An ALJ conducts a five-step inquiry in deciding whether to grant or deny benefits. 20 C.F.R. §§ 404.1520, 416.920. The first step is to determine whether the claimant no longer engages in substantial gainful activity (SGA). *Id.* In the case at hand, the ALJ found that the Plaintiff has not engaged in SGA since her alleged onset date, October 13, 2012. (R. 17.)

At step two, the ALJ determines whether the claimant has a severe impairment limiting her ability to do basic work activities under §§ 404.1520(c) and 416.920(c). In this case, the ALJ

determined that the Plaintiff has diabetes mellitus with neuropathy. (R. 18.) The ALJ found that this impairment caused more than minimal limitations in the Plaintiff's ability to perform basic work activities. (*Id.*) However, the ALJ found that the Plaintiff's other alleged or diagnosed impairments, including hypertension, hyperlipidemia, left hip pain, left carpal tunnel syndrome, and back pain were non-severe. (*Id.*)

Step three requires the ALJ to "consider the medical severity of [the] impairment" to determine whether the impairment "meets or equals one of [the] listings in appendix 1 . . . ." §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment(s), considered singly or in combination with other impairments, rise to this level, there is a presumption of disability "without considering [the claimant's] age, education, and work experience." §§ 404.1520(d), 416.920(d). But, if the impairment(s), either singly or in combination, fall short, the ALJ must proceed to step four and examine the claimant's "residual functional capacity" (RFC)—the types of things he can still do physically, despite his limitations—to determine whether he can perform "past relevant work," §§ 404.1520(a)(4)(iv), 416.920(A)(4)(iv), or whether the claimant can "make an adjustment to other work" given the claimant's "age, education, and work experience," §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Here, the ALJ determined that the Plaintiff's impairments did not meet or equal any of the listings in Appendix 1 and that she had the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), but modified as follows:

> The claimant has the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday. The claimant is capable of occasional postural activities, except no climbing of ladders. The claimant is limited to frequent handling.

(R. 20.)

In doing so, the ALJ evaluated the objective medical evidence and the Plaintiff's subjective symptoms and found that the Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms but that her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible for the reasons explained in the decision. (R. 21.) For example, the ALJ noted that the Plaintiff testified she has some limitation in her activities of daily living but concluded that they are "not indicative of a totally disabled individual." (*Id.*) The ALJ took issue with the fact that the Plaintiff alleged disabling lower extremity pain and problems walking but had "never been prescribed an ambulatory device, such as a cane, brace, or walker. She stated that her mother gave her a cane to use, but a cane was not prescribed by a medical source." (*Id.*)[1] The ALJ classified the Plaintiff's allegations of pain and limitations as "out of proportion to the objective and clinical evidence of record and her treatment history." (*Id.*) After touching on the relevant medical evidence, the ALJ stated:

> Undoubtedly, the claimant has ongoing issues with her lower extremities as a result of neuropathy as seen on her physical examinations showing decreased strength and sensation and loss of modality and reflexes in her feet. However, generally her gait has been normal and she has had some relief of symptoms from Neurontin. Her EMG/NCS testing has shown no more than a mild degree of neuropathy. To account for her neuropathy, the claimant has been limited to work where she could sit for most of the day and would be limited to occasional postural activities, except no climbing of ladders. In terms of her lifting/carrying capabilities, the medical evidence does not support the claimant's contention that she can lift no more than 5 pounds. Other than some mild left upper extremity carpal tunnel, the claimant's upper extremity examinations have been generally normal. Her back pain is mild as well and would not significantly limit her lifting. She would be able to lift/carry 20 pounds occasionally and 10 pounds frequently. To account for her upper

---

[1] The Court notes that the Seventh Circuit has repeatedly held that "the fact that an individual uses a cane not prescribed by a doctor is not probative of her need for the cane in the first place." *Eakin v. Astrue*, No. 10–3121, 432 Fed. Appx. 607, 613 (7th Cir. Jun. 30, 2011) (citing *Terry v. Astrue*, 580 F.3d 471, 477–78 (7th Cir. 2009)); *see also Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("Absurdly, the administrative law judge thought it suspicious that the plaintiff uses a cane, when no physician had prescribed a cane. A cane does not require a prescription . . . .").

extremity symptoms, the claimant has also been limited to frequent, as opposed to constant, handling. This limitation is supported by the clinical findings showing normal fine finger movements, but positive Tinel's.

(R. 23.)

With regard to the opinion evidence, the ALJ afforded the opinions of the State Agency medical consultants—who opined that the Plaintiff was capable of medium exertional level work with frequent postural activities but only occasional climbing of ladders/ropes/scaffolds/and balancing—"limited weight" because the evidence showed the Plaintiff was "more limited than the consultants found." (*Id.*) The ALJ noted that the record did not contain any opinions from treating or examining physicians. (*Id.*)

At step four, the ALJ must determine whether the claimant has the RFC to perform her past relevant work. §§ 404.1520(f), 416.920(f). In this case, the Plaintiff has past relevant work as a cosmetologist/hair dresser, which the ALJ found she was not able to perform. (R. 23–24.)

Finally, at the last step of the sequential analysis, the ALJ must determine whether the claimant is able to make an adjustment to any other work. §§ 404.1520(g), 416.920(g). Relying on the VE's testimony, the ALJ concluded that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 24.) The VE testified that the Plaintiff would be able to perform occupations in the positions of assembly, inspection, and clerking, specifically the following as defined in the Dictionary of Occupational Titles (DOT):

- Assembler (DOT 806.687-010, SVP 2, light, 2,000 jobs in the State of Indiana, 350,000 jobs in the national economy);
- Inspector (DOT 529.687-092, SVP 2, light, 1,800 jobs in the State of Indiana, 325,000 jobs in the national economy); and
- Information Clerk (DOT 237.367-018, SVP 2, light, 1,200 jobs in the State of Indiana, 300,000 jobs in the national economy).

(*Id*.) Thus, the ALJ found that the Plaintiff was not disabled as defined in the Social Security Act. (R. 25.)

## STANDARD OF REVIEW

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). The Social Security Act establishes that the Commissioner's findings as to any fact are conclusive if supported by substantial evidence. *See Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995). Thus, the Court will affirm the Commissioner's finding of fact and denial of disability benefits if substantial evidence supports them. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2009). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Richardson*, 402 U.S. at 399–400. The reviewing court reviews the entire record; however it does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *See Diaz*, 55 F.3d at 608. A court will "conduct a critical review of the evidence," considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (internal quotations omitted).

When an ALJ recommends the denial of benefits, the ALJ must first "provide a logical bridge between the evidence and [his] conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal quotation marks and citation omitted). Though the ALJ is not required to address every piece of evidence or testimony presented, "as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). However, if substantial evidence supports the ALJ's determination, the decision must be affirmed even if "reasonable minds could differ concerning whether [the claimant] is disabled." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## ANALYSIS

As noted above, the Plaintiff argues that the Commissioner erred by: (1) making arbitrary findings regarding the Plaintiff's RFC; and (2) failing to meet the requisite burden of proof at step five with regard to the conclusion that the Plaintiff could perform other work available in the national economy. Specifically, the Plaintiff contends that the ALJ erred in his RFC determination because he had no medical basis to support his determination on the Plaintiff's lifting/carrying capabilities (twenty pounds occasionally and ten pounds frequently) and hand use (frequent handling). The Plaintiff also argues that the ALJ improperly relied on the testimony of the VE about job titles that were inconsistent with the DOT. The Government, on the other hand, contends that the ALJ's RFC determination was supported by substantial evidence because the Plaintiff's allegations of pain were considered in conjunction with the objective and opinion evidence, both of which led to the conclusion that no greater limitations were necessary than

what was given. The Government also argues that the VE provided substantial evidence for her findings that the ALJ was then properly entitled to rely on.

## A.      The ALJ's Step Five Inquiry[2]

At step five, the ALJ must evaluate "the applicant's RFC, as well as [her] age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, [s]he is not disabled." *Craft*, 539 F.3d at 674. The Commissioner bears the burden of proof at this stage and must show "there are a significant number of jobs that the claimant is capable of performing" that exist in the national economy.[3] *Liskowitz v. Astrue*, 559 F.3d 736, 742–43 (7th Cir. 2009) (citations omitted). In making the step five determination, ALJs generally rely on the DOT for information about the "typical characteristics" of jobs as they exist in the economy, and ALJs are required to take administrative notice of job information contained in various publications, including the DOT, which is published by the Department of Labor. *See Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011); 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1). ALJs also often rely on testimony from a VE to "supplement the information provided in the DOT by providing an impartial assessment of the types of occupations in which claimants can work and the availability of positions in such occupations." *Weatherbee*, 649 F.3d at 569 (citing *Liskowitz*, 559 F.3d at 743).

If an ALJ chooses to rely on VE testimony, he must ensure that the testimony comports with the Commissioner's relevant rules and regulations. *Weatherbee*, 649 F.3d at 569. For

---

[2] The Plaintiff begins the discussion section of her brief with her step five argument, so the Court will follow suit.

[3] Work is considered to exist in a national economy "when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." 20 C.F.R. §§ 404.1566(a), 416.966(a).

example, Social Security Ruling (SSR) 00–4p requires an ALJ who takes testimony from a VE or vocational specialist (VS) to "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by the VEs or VSs and information in the *Dictionary of Occupational Titles* (DOT)"[4] and to "[e]xplain in the determination or decision how any conflict that has been identified was resolved." SSR 00–4p. To this end, the ruling sets out an affirmative duty on the ALJ:

> *The Responsibility To Ask About Conflicts*
>
> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> • Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> • If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

*Id*. If an inconsistency exists, "[t]he adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified." *Id*. A claimant's absence of objection to a VE's testimony during a hearing does not excuse the ALJ's failure to obtain a reasonable explanation

---

[4] Evidence may be considered to be in conflict with the Commissioner's policy, for example, based on differing classifications of exertional level demands:

> We classify jobs as sedentary, light, medium, heavy and very heavy (20 CFR 404.1567 and 416.967). These terms have the same meaning as they have in the exertional classifications noted in the DOT.
> Although there may be a reason for classifying the exertional demands of an occupation (as generally performed) differently than the DOT (e.g., based on other reliable occupational information), the regulatory definitions of exertional levels are controlling. For example, if all available evidence (including VE testimony) establishes that the exertional demands of an occupation meet the regulatory definition of "medium" work (20 CFR 404.1567 and 416.967), the adjudicator may not rely on VE testimony that the occupation is "light" work.

SSR 00–4p.

for an apparent conflict. *Brown v. Colvin*, 845 F.3d 247, 254–55 (7th Cir. 2016) (citing *Overman v. Astrue*, 546 F.3d 456, 462–63 (7th Cir. 2008)). Overall, a VE's testimony can only satisfy the Commissioner's burden of proof of establishing that the claimant can perform other work that exists in significant numbers in the national economy if it is reliable. *See Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir.2008). "A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Id*.

In this case, a review of the transcript from the administrative hearing reveals that the ALJ posited four hypotheticals to the VE. The first two hypotheticals resulted in a conclusion by the VE that the Plaintiff could perform her past relevant work; at the third—which limited lifting/carrying to twenty pounds occasionally and ten pounds frequently, standing to two hours in an eight hour day, sitting to six hours in an eight hour day, "non-exertional"[5] limitations to occasional, and no ladders—however, the VE deduced that past relevant work was not possible, that there were no transferrable skills, and that there would only be jobs in an "unskilled limited range of light" work that could be performed. (R. 52–53.)[6] Specifically, the VE described those jobs as "assembly positions, DOT of 806.687–010," "inspection positions, DOT of 529.687–

---

[5] None of the ALJ's original hypotheticals specifically addressed the effect of any non-exertional manipulative limitations. In the first hypothetical, the ALJ expressed non-exertional limitations as "frequent rather than constant stairs, stoop, balance, kneel, crouch, and crawl, and just occasional ladders." (R. 53.) The second and third hypothetical expressed the same general non-exertional requirements except with "now occasional rather than frequent, and no ladders." (*Id*.) Upon examination of the VE by the Plaintiff's attorney, the VE testified that a hypothetical that was the same as the ALJ's third but with only "occasional handling, fingering, and feeling" would make the "unskilled limited range of light" jobs previously described by the VE obsolete. (R. 53–54.) However, the VE indicated those jobs would be available if the handling, fingering, and feeling was limited to "frequent" as opposed to occasional. (R. 54.) The ALJ's RFC determination limited the Plaintiff to "frequent handling." (R. 20.)

[6] The final hypothetical limited lifting to ten pounds occasionally and five pounds frequently, standing to two hours in an eight hour day, sitting to six hours in an eight hour day, non-exertional limitations to occasional, and no ladders; the VE confirmed that this hypothetical would result in a sedentary classification with no transferable skills. (R. 54.)

092," and "clerking positions, DOT of 237.367–018." (R. 53.) According to the DOT, the

referenced assembly position is defined as follows:

> **806.687–010 ASSEMBLER, BICYCLE II (motor-bicycles)**
> Assembles bicycles on assembly line, performing one or a combination of tasks as described under ASSEMBLER, BICYCLE (motor-bicycles) I, using handtools and portable power tools. May assemble and package bicycle subassemblies, such as shift levers, axles, and reflectors and be designated Bicycle Subassembler (motor-bicycles).
> GOE: 06.04.22 STRENGTH: L GED: R1 M1 L1 SVP: 2 DLU: 77

http://www.govtusa.com/dot; *see also* DICOT 806.687–010, 1991 WL 681498, at *1

(Jan. 1, 2016). The referenced clerking position is defined in the DOT as:

> **237.367–018 INFORMATION CLERK (motor trans.; r.r. trans.; water trans.) alternate titles: travel clerk**
> Provides travel information for bus or train patrons: Answers inquiries regarding departures, arrivals, stops, and destinations of scheduled buses or trains. Describes routes, services, and accommodations available. Furnishes patrons with timetables and travel literature. Computes and quotes rates for interline trips, group tours, and special discounts for children and military personnel, using rate tables.
> GOE: 07.04.04 STRENGTH: L GED: R4 M2 L3 SVP: 2 DLU: 77

http://www.govtusa.com/dot; *see also* DICOT 237.367–018, 1991 WL 672187, at *1 (Jan. 1,

2016). However, as pointed out by the Plaintiff, there is no inspection position—or any position

for that matter—with a DOT number of 529.687–092.[7] Regardless, it is undisputed that the

---

[7] The Government argues that "[i]t is clear that in her testimony, the VE simply misstated the last three digits of the inspection job number in the DOT," and that the error is harmless "given that the inspection job appears under a similar number and fits the criteria outlined in the RFC." (R. 22, p. 8.) The Government cites to the following job in support of its argument:

> **529.687–114 INSPECTOR (sugar & conf.)**
> Inspects candy or chewing gum in containers or on conveyor to ensure that it is formed, coated, cupped, wrapped, or packed according to plant standards: Weighs containers [WEIGHER, PRODUCTION (any industry) 929.687-062]. Rewraps, recups, rearranges, or replaces pieces not meeting standards. May stamp date of inspection on boxes or return them to packing department with reason for rejection. May pack boxes in shipping cartons.
> GOE: 06.03.02 STRENGTH: L GED: R2 M1 L2 SVP: 2 DLU: 77

http://www.govtusa.com/dot; *see also* DICOT 529.687–114, 1991 WL 674763, at *1 (Jan. 1, 2016). The Court agrees with the Government that a discrepancy between job title listings articulated by the VE does not create reversible error in and of itself. *See Weatherbee*, 649 F.3d at 572. However, the same issues

positions referenced by the ALJ are classified as "light work" which the regulations define as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, *a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls*. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b) (emphasis added); *see also* SSR 83–10 ("[A] job is in this category when it requires a good deal of walking or standing—the primary difference between sedentary and most light jobs. . . . Relatively few unskilled light jobs are performed in a seated position."); SSR 00–4p (SSA regulatory job classifications have the "same meaning" as those found in the DOT, and "those regulatory definitions of exertional levels are controlling."). Because light work includes "frequent lifting or carrying," which "requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." SSR 83–10. A sedentary job, on the other hand, "is defined as one which involves sitting, [although] a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." §§ 404.1567(a), 416.967(a). "Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83–10.

---

described throughout this opinion apply equally to this job title as to the other correctly referenced listings.

It is not clear from the DOT job descriptions noted above whether pushing or pulling of arm or leg controls is an element of the job requirements or whether, conversely, they entail "a good deal of walking or standing" (*see* §§ 404.1567(b), 416.967(b)), which would likely conflict with the ALJ's two hour standing/walking limitation. The Plaintiff contends that the jobs referenced by the VE are "clearly in the category of 'light' and do not in any way address additional functional limitations that erode the work category." [ECF No. 19, p. 10.] Seeming to identify a potential conflict between the VE's testimony and the occupational information supplied by the DOT, the ALJ asked the VE the following questions at the hearing:

> Q: And the jobs are consistent with the description in the Dictionary of Occupational Titles except you've adjusted the numbers for the two-hour standing?
> A: That's correct, Your Honor.
> Q: And that's based on your education and experience?
> A: That's correct, Your Honor.

(R. 54.) The Government argues that this exchange was sufficient to meet the ALJs duty described in SSR 00–4p. The Court agrees with the Plaintiff that it was not.

The parties do not dispute that the ALJ satisfied the first part of his duty by asking about consistency with the DOT in general. Yet, the phrasing of his question to the VE suggests that the ALJ himself identified a potential conflict—he implicitly asked the VE about the inconsistency between typical "light" work exertional requirements and the functional standing limitations akin to sedentary positions supplied by his hypothetical, which the VE had previously testified would erode the available jobs to an undefined subclass of light work she referred to as an "unskilled limited range of light." The Government acknowledges as much in its response brief [ECF No. 22, p. 10] ("Plaintiff insists that neither the ALJ nor the VE acknowledged the alleged conflict, but the ALJ explicitly asked her if her testimony was consistent with the DOT 'except' for the adjustment of the numbers to account for the two-hour standing."); *see also*

13

*Overman*, 546 F.3d at 464 ("[T]he ALJ's attempt to explain away the seemingly contradictory statements is tantamount to an acknowledgment that there were apparent discrepancies."). The VE's perfunctory answer of "That's Correct, Your Honor," seems to lend credence to the Plaintiff's contention that a conflict was identified—because consistency "except for" a named variable is not truly consistent at all. At the very least, the testimony on the matter is ambiguous and requires clarification. The Seventh Circuit has made it clear that an "unresolved potential inconsistency" must be explored by the ALJ. *See Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006). Remand is appropriate, for example, where a posited hypothetical may erode certain titles within a job category previously identified by the VE as consistent with the DOT. *See Craft*, 539 F.3d at 681 ("On remand, the ALJ should further explore any potential conflicts between the VE's testimony and the DOT to ensure that the jobs' requirements are consistent with [the claimant's] abilities."). Thus, the question here becomes whether, after identifying a potential inconsistency, the ALJ elicited a reasonable explanation for it from the VE in accordance with SSR 00–4p's second directive.

In *Brown*, a VE testified that a person with the claimant's RFC could work as a greeter/attendant as defined in the DOT. *Brown*, 845 F.3d at 255. The VE explained an apparent conflict between light work and sedentary work by noting that "greeters in theaters and in building lobbies typically have the option of sitting or standing, and that she had 'place[d] a lot of people in those jobs, who use chairs, and are seated." *Id*. The claimant argued that the VE's explanation was unreasonable because it lacked support. *Id*. Calling the matter "close," the Seventh Circuit acknowledged that the VE's testimony was not conclusory because she had testified that she had personal experience placing people in sedentary greeter positions, yet it

agreed with the claimant that the ALJ had erred[8] in his treatment of the matter because "the record does not indicate that [the VE's] knowledge on the topic exceeds that of the DOT authors, or that her opinion is informed by another reliable publication." *Id*. The Seventh Circuit took issue with the fact that the ALJ failed to pose any additional follow-up questions on the subject and stated:

> [W]e are left without any additional information about the approximate percentage of the greeter positions that can be performed in a sedentary manner. Perhaps it is 95%; or perhaps it is closer to 9%, which would be an insufficient ground for trumping the DOT. In addition, the DOT listing that the vocational expert cited at the hearing (DOT 342.667–014, Attendant–Arcade) is unhelpful, since it lists job responsibilities that likely are not sedentary—in particular, 'Perform[ing] minor repairs on game machines'; 'Remov [ing] coin accepter mechanism of machines, using key, and observ[ing] mechanism to detect causes of malfunctions, such as bent coins, slugs, or foreign material'; and 'Remov[ing] obstructions, reposition[ing] mechanism, insert[ing] coins, and observ[ing] machine operation to determine whether malfunctions are still present.

*Id*.

Similarly, in the instant case, the ALJ did not elicit a reasonable explanation for the potential conflict he identified. Rather, when asked about it, the VE simply rested on the ALJ's reference to the existence of her "education and experience" without providing any additional details whatsoever. Unlike the VE in *Brown*, the VE in this case did not describe relevant personal experience dealing with and/or placing people in any of the jobs about which she testified. Her testimony did not shed light on the specific job responsibilities set forth in the aforementioned DOT listings and did not address whether they were amenable to adjustments for sedentary-type standing/walking limitations. Furthermore, the ALJ did not pose any follow-up

---

[8] The court ultimately determined that the error was harmless because the other five positions that the VE testified about did not conflict with the DOT. *Brown*, 845 F.3d at 255.

questions during the hearing or expand upon the issue in his decision.[9] Thus, the same concerns pointed out by the Seventh Circuit in *Brown*—namely, the extent of the potential erosion of available jobs in the listings relied upon by the VE due to the ALJ's added exertional limitations—is also present here. An ALJ may credit conflicting testimony if the VE's "experience and knowledge in a given situation exceeds that of the DOT's authors, or when the [VE's] contrary testimony is based on information in other reliable publications," *Brown*, 845 F.3d at 255 (quoting *Overman*, 546 F. 3d at 464), but he must have elicited a reasonable explanation from the VE about the conflict before doing so. It is true that the standard for eliciting such an explanation under SSR 00–4p is not an onerous one; it requires "less than [a] searching inquiry" and can be satisfied by testimony regarding a VE's "experience in job placement or career counseling." *Meyerink v. Colvin*, No. 2:13-CV-327-PRC, 2015 WL 773041, at *12 (N.D. Ind. Feb. 24, 2015) (citing SSR 00–4p and noting that the ruling does not "specify a level of articulation that the VE must meet"). That said, relevant case law suggests that something more than a conclusory statement is required. *See Brown*, 845 F.3d at 255 (VE testified as to her "personal experience" placing individuals in the specific job position at issue, yet the court found that her knowledge did not exceed the DOT authors); *Meyerink*, 2015 WL 773041, at *13 (finding that VE's testimony satisfied SSR 00–4p's "reasonable explanation" requirement because he "went beyond simply saying that his conclusions were based on his experience" and instead included "examples" of placing individuals in the jobs he mentioned, observing those jobs, and analyzing them). Even acknowledging that the VE who testified was a "[c]ertified licensed rehabilitation counselor" since 2000 according to her resume that was entered into the record without objection (R. 51, 172), it is difficult to classify her response of

---

[9] The ALJ stated that the VE "adjusted the numbers given for standing/walking 2 hours based on her education and experience in job surveys/placements."

"That's correct, Your Honor," when asked to confirm that the "adjust[ment]" was based on her education and experience as anything other than conclusory. As such, a "reasonable explanation" as contemplated by SSR 00–4p was not elicited here, which constituted error on the part of the ALJ.

Citing to *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002), the Government argues that the Plaintiff forfeited any argument under SSR 00–4p because the Plaintiff's attorney did not challenge the VE's testimony at the hearing. However, several years after *Donahue* was decided, the Seventh Circuit made it clear that an ALJ must elicit a reasonable explanation for any apparent discrepancies, regardless of whether the issue was raised at the hearing or not. *Prochaska*, 454 F.3d at 735 (citing *Haddock v. Apfel*, 196 F.3d 1084, 1087 (10th Cir. 1999)); *see also Brown*, 845 F.3d at 255 (noting that a claimant's failure to object does not negate the need for a reasonable explanation); *Overman*, 546 F. 3d at 463 (same). Here, as noted above, the ALJ *himself* seemingly identified a potential discrepancy, making it apparent—at least to him—and thus the affirmative requirements of SSR 00–4p were triggered regardless of the Plaintiff's lack of objection.

The Government also argues that, per *Donahue*, the ALJ was entitled to rely on the VE's "unchallenged" bottom-line testimony, so the ALJ satisfied the necessary requirements regardless. *Donahue* provides that an expert is free to give a bottom-line conclusion, so long as the underlying data and reasoning are available to the parties on demand. *Donahue*, 279 F.3d at 446. An ALJ is permitted to rely on that conclusion "[w]hen *no one* questions the vocational expert's foundation or reasoning," even if it differs from the DOT. *Id.* (emphasis added); *see also Barrett v. Barnhart*, 355 F.3d 1065, 1067 (2004) (any objection to VE's "purely conclusional" testimony was forfeited because it was not questioned at the hearing). However, if the testimony

is questioned at the hearing or a potential conflict is identified by "the claimant (or the ALJ on

his behalf)," then the ALJ should "make an inquiry (similar though not necessarily identical to

that of Rule 702) to find out whether the purported expert's conclusions are reliable." *Id*. Thus,

*Donahue* remains good law to the extent that it does not conflict with SSR 00–4p. *Meyerink*,

2015 WL 773041, at *11-12 (examining SSR 00–4p and *Donahue*, the "two separate sources of

law at play regarding what qualifies as adequate VE testimony"). SSR 00–4p applies to the

ALJ's treatment of conflicts, while *Donahue* "allows the ALJ to rely on the VE's bottom line in

all areas *not* covered by SSR 00–4p." *Id*. at 12 (emphasis added).[10] Here, for the reasons set forth

above—namely, because the ALJ seemingly identified a potential conflict during the hearing and

failed to elicit a reasonable explanation from the VE for it—the requirements of SSR 00–4p are

at play rather than those set forth in *Donahue*.

That said, even assuming arguendo that the ALJ's awkwardly worded questioning of the

VE did not identify a potential conflict but rather simply confirmed that the VE's testimony was

consistent with the DOT—thus relieving the ALJ of SSR 00–4p's duty to obtain a reasonable

explanation for a conflict—the analysis would not end there. In *Barrett*, the Seventh Circuit

addressed a situation similar to the case at hand, except that no conflict was identified by the

claimant or the ALJ at the time of the hearing. *Barrett*, 355 F.3d at 1066–67. In that case, the

ALJ had determined that the claimant could perform a wide range of "light" work, including

---

[10] *Overman* does not dictate a different result. It is true that in *Overman*, the standards for both SSR 00–4p and *Donahue* were addressed. *Overman*, 546 F.3d at 464–65. The court noted that an ALJ may rely on imperfect, unchallenged VE testimony pursuant to *Donahue* and ultimately concluded that the plaintiff had not waived the argument related to the VE's conclusions because the plaintiff's counsel adequately— albeit not thoroughly—challenged the testimony on cross-examination. *Id*. However, the court only addressed the *Donahue* issue *after* reaching its conclusion that the ALJ had erred by violating SSR 00–4p by failing to obtain a reasonable explanation for the DOT conflicts, specifically stating that the additional arguments were persuasive "[e]ven if" the ALJ had not erred via the handling of SSR 00–4p. *Id*. at 464.

factory work, provided that she was limited to no more than two hours of standing at a time,[11] no more than six hours of sitting at a time, and lifting of twenty pounds frequently as opposed to constantly. *Id*. At the administrative hearing, a VE testified that there were 24,500 jobs in Wisconsin that a person with the claimant's same restrictions could do. *Id*. at 1067. Neither the claimant's attorney nor the ALJ questioned this testimony or pointed out a potential conflict, so the Seventh Circuit held that any objection was forfeited despite the fact that the testimony was "purely conclusional," left the court "in the dark," and offered "no indication" of how the VE adjusted the numbers in the DOT to reflect a particular subclass of light work that would account for the claimant's diminished capacity. *Id*. However, the Seventh Circuit went on to remand the matter for a "fresh analysis of the evidence" because "the validity of the testimony still depends on whether the administrative law judge accurately described [the claimant's] condition to him; for the testimony was perfunctory and 'nothing in the record reflects that [he] independently knew of all the limitations related to' [the claimant's] condition." *Id*. (citing *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)). Here, the testimony was similarly perfunctory, and the VE confirmed only that she had looked at the "vocational aspects" of the Plaintiff's file and submitted a report of her past work. (R. 51, 259.) Thus, it was vital that the Plaintiff's condition was accurately communicated to the VE during the hearing and that her RFC was properly determined by the ALJ; because—for the reasons set forth below—it was not, the validity of the testimony is in question, and the matter must be remanded. *Barrett*, 355 F.3d at 1067 (ALJ's flawed analysis of claimant's condition warranted remand).

---

[11] On appeal, the court noted that the standing limitation was not directly based on any medical evidence because the only doctor who had limited standing had opined that she could stand for up to six hours at a time. *Barrett*, 355 F.3d at 1067.

**B.    The ALJ's Residual Functional Capacity Determination**

RFC is an "assessment of what work-related activities the claimant can perform despite her limitations" and must be based on all the relevant evidence in the record. *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004) (citations omitted). An ALJ must assess "the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect [the claimant's] capacity to do work-related physical and mental activities" in a work setting on a "regular and continuing basis." SSR 96–8p. The "aggregate effect" of a claimant's "entire constellation of ailments" must be considered, even those that are not severe in isolation, and an ALJ may not ignore a line of evidence that would be contrary to his decision. *Golembiewski v. Barnhart*, 322 F.3d 912, 917–18 (7th Cir. 2003) (citations omitted); *see also Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009).

The Plaintiff argues that the ALJ failed to properly evaluate her ability to lift, carry, and use her hands due to pain issues related to neuropathy and carpal tunnel syndrome and made the related limitation conclusions via speculation rather than actual evidence. The Government, on the other hand, insists that the ALJ discussed the medical evidence in detail and sufficiently supported his RFC determination. Because the ALJ's logic related to the limitations he imposed is not apparent on the face of the decision, the Court agrees with the Plaintiff. For example, the ALJ limited the Plaintiff to lifting/carrying twenty pounds occasionally and ten pounds frequently, but it is unclear what those limitations are based upon. The only physicians to opine as to lifting/carrying were the State agency medical consultants who indicated that the Plaintiff could lift up to fifty pounds occasionally and up to twenty-five pounds frequently. (R. 63, 72, 84, 94.) Those same consultants also opined that the Plaintiff could stand and/or walk for six hours a

day. (*Id.*) Yet, the ALJ gave those opinions "limited weight," finding that the Plaintiff was "more limited than the consultants found." (R. 23.) The ALJ's decision does not adequately explain his basis for determining the specific weight and frequency limitations he assigned to the Plaintiff.[12] *See Barrett*, 355 F.3d at 1067–68 (finding the ALJ's two hour standing limitation lacked sufficient evidentiary basis because the only physician who had specified limitations had advised the claimant could stand for up to six hours at a time); *see also Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) ("Being unable to discern how—apart from substituting his own judgment for that of the medical witnesses—the ALJ reached his determination regarding the degree of [the claimant's] impairments, we must reverse and remand for further proceedings."). When discussing the implementation of further lifting/carrying limitations, the ALJ simply stated that the medical evidence did not support the Plaintiff's contention that she was unable to lift more than five pounds because her upper extremity examinations were "generally normal"—"[o]ther than some mild left upper extremity carpal tunnel"—and because the Plaintiff's mild back pain would not significantly limit her lifting. (R. 22–23.) He then went on to limit her handling to frequent, as opposed to constant, specifically "[t]o account for her upper extremity symptoms." (R. 23.) But neither a "generally normal" physical ability to lift something nor a limitation on handling necessarily accounts for allegations of pain related to that lifting on what the ALJ described as "undoubted[]" "ongoing issues with her lower extremities as a result of neuropathy." (*Id.*) At the hearing, the Plaintiff testified that she could not hold or pick up her three-year-old grandson who weighed approximately ten pounds "because of the pressure that he puts on my feet." (R. 38.) She later stated that she did not lift her grandkids "because of my

---

[12] Neither does it adequately explain his basis for determining the walking/standing limitations he assigned to the Plaintiff, which is problematic for similar reasons.

hands and my feet" and could not lift heavier grocery store items such as bags containing gallons of milk or soap detergent, although "light stuff like toilet paper" did not cause her pain. (R. 46–47.) Similarly, in her Function Report, the Plaintiff stated that, among other limitations, she could only lift about five pounds because it was "not good on [her] feet and legs because of the nerve damage in [her] legs and feet." (R. 230.) While this evidence was briefly referenced in the decision,[13] the ALJ did not address it in the context of ascribing specific lifting/carrying limitations to the Plaintiff in light of her neuropathy. And, because the ALJ also did not adequately explain the basis for his two-hour standing/walking limitation,[14] it is unclear whether he properly considered the Plaintiff's alleged lifting-related issues in combination with her other impairments. *See Villano*, 556 F.3d at 563 (finding that the ALJ's "cursory analysis does not give us confidence that he had appropriate reasons for rejecting the limitations [the claimant] alleged" and faulting the ALJ for the lack of analysis with regard to the "combined effect" of the claimant's impairments, the drawing of improper inferences about her ability to sit "based solely on a lack of objective medical evidence," the failure to discuss her depression, and the incorrect conclusion that the claimant's limited daily activities contradicted her claims of disabling pain);

---

[13] The testimony was essentially rearticulated and then subsequently dismissed as being "not entirely credible" because the daily activities she described were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations," and were "not indicative of a totally disabled individual." (R. 21.)

[14] Again, the only physicians to opine as to standing/walking limitations concluded that the Plaintiff could stand/walk for up to six hours a day. (R. 63, 72, 84, 94.) In finding that a two hour limitation was more appropriate, the ALJ simply stated that it was to "account for" the Plaintiff's mild lower level neuropathy so that she could "sit most of the day and would be limited to occasional postural activities." (R. 23.) Yet the reasoning behind this particular limitation is not clear on the face of the decision. *See Barrett*, 355 F.3d at 1068 ("[W]e do not know on what basis he decided that [the claimant] can stand for two hours at a time. No physician said that. A great many people who are not grossly obese and do not have arthritic knees find it distinctly uncomfortable to stand for two hours at a time. To suppose that [the claimant] could do so day after day on a factory floor borders on the fantastic, but in any event has no evidentiary basis that we can find.").

*see also Barrett*, 355 F.3d at 1068–69 ("Even if [the claimant's] arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritic as she but not both. Similarly, the numbness and pain in her arm may not be severe, but they are additive to the acute discomfort that she must experience in prolonged standing while all the time straining to hear.").

Comparable problems are present with regard to the ALJ's treatment of the Plaintiff's handling limitation. The ALJ determined that the Plaintiff's left carpal tunnel syndrome was "mild and non-severe," and he limited her to frequent as opposed to constant handling. (R. 18, 23.) He stated that the limitation was "supported by the clinical findings showing normal fine finger movements, but positive Tinel's." (*Id*.) Yet, as the Plaintiff points out, the basis for that determination remains in question. Like the other limitations mentioned above, the only physicians to opine as to the Plaintiff's handling capabilities were the State agency medical consultants who indicated that no manipulative limitations were necessary; however, the ALJ discounted those opinions because he believed the record showed the Plaintiff was more limited than the consultants found. (R. 23, 64, 73, 85, 95.) *See e.g.*, *Barrett*, 355 F.3d at 1068–69. When discussing the Plaintiff's condition, the ALJ acknowledged a 2013 EMG documenting mild left carpal tunnel syndrome, and he described the clinical findings from follow-up visits throughout 2013 as showing mainly normal range of motion and muscle strength in her upper extremities. (R. 22.) He indicated that the Plaintiff began treating at a pain clinic in May 2014 and again noted clinical findings pointing to a "full range of motion of her wrists and hands" and no upper extremity weakness. (*Id*.) However, the ALJ did not address the most recent upper-extremity EMG from July 2014 in any way. (R. 22–23.) In that EMG report, Julian Ungar-Sargon, M.D.

from the Neurology and Pain Management clinic noted "decreased amplitudes, but normal latencies" related to the numbness in the Plaintiff's hands, but he left the conclusion section of the report blank and did not provide further analysis. (R. 376.) While it is true that the ALJ need not address every piece of medical evidence, the Court agrees with the Plaintiff that the failure to elicit additional clarification of or medical evidence related to these most recent upper extremity EMG findings is troubling because an ALJ must not fill evidentiary gaps in the record using his own opinion or conjecture. *See Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *see also Murphy v. Astrue*, 496 F.3d 630, 635 (7th Cir. 2007) ("ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.") (internal citations omitted); *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (failure to develop a "full and fair record" is reason to remand for gathering of more evidence). This failure, coupled with both the lack of physician-based opinions on manipulative limitations and the ALJ's treatment of the Plaintiff's testimony related to her upper extremity issues,[15] makes it difficult to trace his logic in crafting the handling limitations as he did. Viewed in conjunction with the issues related to the ALJ's lifting/carrying analysis, the Court cannot conclude that the ALJ properly considered the Plaintiff's medical situation as a whole or included all of the relevant limitations when crafting the Plaintiff's RFC as he was required to do. *See Golembiewski*, 322 F.3d at 917–18; *see also Villano*, 556 F.3d at 563.

In sum, the "cumulative effect" of the errors and omissions described throughout this order regarding the ALJ's determination of the Plaintiff's RFC and his handling of the VE's

---

[15] At the hearing, the Plaintiff testified that the "bad" bilateral neuropathy and left side carpal tunnel syndrome caused her to experience extreme feelings of coldness in her hands and affected her ability to do things like hold clippers, roll hair, and lift or carry her grandchild and grocery store items. (R. 46–47.) But, as with the Plaintiff's allegations regarding her lifting issues, these were dismissed as being "not entirely credible" because the daily activities she described were not as limited as the ALJ expected. (R. 21.)

testimony at step five warrant remand. *See Barrett*, 355 F.3d at 1069 ("The cumulative effect of the administrative law judge's errors and omissions was to fail to build a rational bridge from the evidence to the finding that [the claimant] was not totally disabled.").

## CONCLUSION

For the reasons stated above, the Court REVERSES and REMANDS this case for further proceedings in accordance with this Opinion and Order.

SO ORDERED on October 18, 2018.

<u> s/ Theresa L. Springmann</u>
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT